1
2
3
4
5
6
7
8
9
10
11
12
13
14
15

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Nadia Cristina da Rocha Rosado, | |
| Petitioner, | No. CV 25-02157 PHX DLR (CDB) |
| v. | **REPORT AND RECOMMENDATION** |
| Fred Figueroa, Warden, Eloy Detention Center; John Cantu, Field Officer Director, ICE Phoenix; Kristi Noem, Secretary of the U.S. Department of Homeland Security; Pamela Bondi, Attorney General of the United States, | |
| Respondents. | |

16   **TO THE HONORABLE DOUGLAS L. RAYES:**

17        Petitioner Nadia da Rocha Rosado seeks relief pursuant to 28 U.S.C. § 2241, asking

18   the Court to order her release from federal custody. Rosado is scheduled for a master

19   hearing on August 14, 2025, before an Immigration Judge in Eloy, Arizona.

20        **I.        Background**

21        Rosado was born in Brazil in 1986. On October 9, 2018, Rosado and her daughter

22   applied for entry into the United States at a port of entry in El Paso, Texas, and were

23   detained. (ECF No. 11-1 at 2). Respondents aver Rosado was "initially processed for

24   expedited removal." (*Id.*). Rosado was found to be inadmissible pursuant to

25   § 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act ("INA").[1] (*Id.*).

26

27

28        _____

     [1] This section applies to an alien applying for admission who is not in possession of a valid entry document.

On October 10, 2018, Rosado was served with a Notice to Appear, placing her in removal proceedings pursuant to INA § 240A, 8 U.S.C. § 1229a. (ECF No. 11 at 2).[2] Respondents assert: "On October 15, 2018, the Department released the Petitioner from custody and ordered the Petitioner to report to the Boston Field Office located [in Burlington, Massachusetts] on October 24, 2018." (*Id.*). Respondents state that Rosado was "released from custody" "for discretionary reasons" (ECF No. 11 at 3). Additionally, the Notice to Appear, which is attached to Respondents' response to the petition, ordered Rosado to appear before an immigration judge ("IJ") in Boston, Massachusetts, on November 30, 2018, not October 24, 2018. (ECF No. 11-2 at 1). The Notice to Appear cites § 212(a)(7)(A)(i)(I) of the INA, and notes no credible fear had been demonstrated by Rosado before a hearing officer. (ECF No. 11-2 at 1, 3). The Notice to Appear also stated Rosado's "current" address as 49 Pearl Street, Milford, Massachusetts, her address at the time of her detention in 2025. (ECF No. 11-2 at 1; ECF No. 1 at 1).

Rosado was then, after inspection and being detained for five days, and after being served with the Notice to Appear, released from custody pending a hearing before an IJ in Massachusetts.

No party has advised the Court as to what occurred when Rosado did, or did not, report to an IJ at the Boston Field Office on November 30, 2018, pursuant to the Notice to Appear. Publicly available information regarding Rosado's immigration proceedings, under her A Number 201-398-363, indicates her case was "docketed" on January 3, 2020. *See* https://acis.eoir.justice.gov/en/caseInformation (last visited Aug. 10, 2025).

On November 10, 2022, Rosado filed an Application for Asylum, Withholding of Removal, and Protection Under the Convention Against Torture (I-589). (ECF No. 1 at 1-2. *See also* ECF No. 11 at 2). On June 27, 2023, the United States Citizenship and Immigration Services ("UCIS") notified Rosado that it had received her I-589 application for asylum and withholding of removal, "filed in defense of removal," and advised she was

---

[2] Elsewhere Respondent asserts: "On April 24, 2018, the Petitioner was placed into removal proceedings in Boston, MA." (ECF No. 11-1 at 2). This appears to be a typographical error, because in April of 2018 Rosado had not yet appeared at the United States Border in Texas.

required to notify the USCIS in writing of any address change "[s]ince you were placed in removal proceedings." (ECF No. 1-1 at 6).

Although Rosado was deemed inadmissible and subject to removal when she was processed at the border, no party asserts that Rosado was ever, or is currently, subject to an order of removal from the United States. On or about October 10, 2018, it was determined by the United States government that Rosado should be released from custody and not be detained pending the outcome of removal proceedings, and based on the record before the Court at no subsequent time through April of 2025 did any IJ determine that Rosado should be detained pending the resolution of her removal proceedings or a decision on her application for asylum and withholding of removal.

At the time of her detention on April 30, 2025, Rosado was scheduled for a "Internet-based" hearing on her application for asylum and withholding of removal before an IJ in Massachusetts on July 9, 2026. (ECF No. 1-1 at 7).

Rosado asserts:

On April 30, 2025, Ms. Rosado was detained by Immigration and Customs Enforcement ("ICE"). Ms. Rosado was apprehended at her house, when officers came to arrest her son. Before allowing them to enter, she asked if they had a warrant, and asked them to show any warrant in their possession prior to allowing them to come in. *Once the officers showed the warrant, she allowed them to enter*, but they also detained her, *claiming that she obstructed their operation by asking to see the warrant*.

(ECF No. 1 at 4) (emphasis added).

Respondents contend:

… ICE officers *were notified about an arrest being made* at Petitioner's home of an undocumented immigrant, Petitioner's son. Exhibit A ¶ 9. The Milford Police had a valid warrant for Petitioner's son who was in the United States without status. *Id.* This provided them with reasonable suspicion that Petitioner, his mother, may also be in the United States without lawful status, and she identified herself as being in the United States without lawful status.

(ECF No. 11 at 7).

Respondents also assert:

> 9. On April 30, 2025, immigration officers identified the Petitioner in her residence *after* the Milford Police Department executed an arrested [sic] warrant for the Petitioner's son. When it was determined that Petitioner was an inadmissible alien without lawful status in the United States, she was taken into custody by ICE.

(ECF No. 11 at 2).

It is not clear from the record whether immigration officers were initially present at the time the warrant for Rosado's son was executed by the local police.

Shortly after noon on April 30, 2025, the day she was taken into custody, a Deportation Officer in Massachusetts ordered Rosado be detained by the Department of Homeland Security. (ECF No. 1-1 at 2). The Deportation Officer issued a Notice of Custody Determination (I-286) "pending a final administrative determination" in her case, citing INA § 236 (codified at 8 U.S.C. § 1226). (*Id.*). The I-286 also provided an option for the Deportation Officer to order release on bond, on recognizance, or on conditions. (*Id.*).

Notwithstanding that there are three immigrant detention centers in Massachusetts, on May 5, 2025, Rosado was transferred to the Eloy Detention Center in Eloy, Arizona. (ECF No. 11-1 at 2). "On May 16, 2025, [Rosado] filed a request for a custody redetermination." (*Id.*). Respondents assert: "On May 22, 2025, at the conclusion of the custody redetermination hearing, the Petitioner was denied bond in accord with 8 C.F.R. § 1003.19(h)(2)(i)(B)."[3] (*Id.*). This section of the Code of Federal Regulations was not cited by the IJ in their order issued May 22, 2025. The order regarding Rosado's request

---

[3]  Subsection (h)(2)(i)(B) provides:
(2)(i) Upon expiration of the Transition Period Custody Rules … an immigration judge may not redetermine conditions of custody imposed by the Service with respect to the following classes of aliens:
*** 
(B) Arriving aliens in removal proceedings, including aliens paroled after arrival pursuant to section 212(d)(5) of the Act …
Section 212(d)(5) of the INA is codified at 8 C.F.R. 212.5. The Transition Period Custody Rules expired on October 9, 2018. An alien paroled after arrival pursuant to section 212(d)(5) of the INA is typically an arriving alien who has serious medical conditions, is pregnant, or is a minor in custody.

for a custody redetermination hearing pursuant to 8 C.F.R. § 1236 states the IJ was denying Rosado's request for redetermination of her custody based on "No jurisdiction. The Respondent is an arriving alien. INA 235(b)(2)(A)."[4] (ECF No. 1-1 at 4). Rosado reserved her right to appeal this decision. (ECF No. 1-1 at 5).

Respondents assert:

13. On June 18, 2025, [Rosado] filed an appeal with the Board of Immigration Appeals (BIA) challenging the denial of her custody redetermination request. *This appeal is still pending before the BIA. As of the date of this declaration [July 17, 2025], a briefing schedule has not been issued, nor has the BIA made a decision on the Petitioner's 's [sic] appeal.*

(ECF No. 11-1 at 2) (emphasis added).

Rosado filed her § 2241 petition on June 23, 2025. On July 9, 2025, her removal proceedings were transferred from the Massachusetts Immigration Court. (ECF No. 11-1 at 2-3). At some point afterward the hearing set for July of 2026 was vacated, and after the response to her § 2241 petition was docketed a master hearing at the Eloy Immigration Court was set for August 14, 2025. *See* https://acis.eoir.justice.gov/en/caseInformation (last visited Aug. 10, 2025). The hearing is presumably regarding her application for asylum and withholding of removal.

Rosado's § 2241 habeas petition asserts the IJ evaluating the custody redetermination application erred in finding a lack of jurisdiction, i.e., the IJ incorrectly concluded that Rosado's custody pending a final decision on her removal was and is mandatory. (ECF No. 1 at 5). Rosado also asks the Court to "declare that [her] detention violates the Due Process Clause of the Fifth Amendment, as well as the Fourth Amendment," and "[i]ssue a Writ of Habeas Corpus ordering Respondents to release [her] immediately…" (ECF No. 1 at 15).

---

[4] Section 235(b)(2)(A), codified at 8 U.S.C. § 1225(b)(2)(A), provides: "in the case of an alien who is an application for admission, if the examining officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under 8 U.S.C. § 1229a." Section 1229a governs removal proceedings before an IJ, providing the noncitizen a right to inspect the evidence against them and to present evidence.

## II.    Claims for Relief

The primary disagreement between the parties is whether Rosado is now, after more than six years of residence in the United States with the government's acquiescence, subject to mandatory detention pursuant to section 8 US.C. § 1225, or whether in the redetermination of custody decision issued May 22, 2025, the Eloy IJ erred by finding they had no jurisdiction to grant Rosado release on bond or otherwise because Rosado is actually subject to discretionary release pursuant to 8 U.S.C. § 1226.

Rosado argues:

30. Under 8 U.S. Code § 1225, "An alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters) shall be deemed for purposes of this chapter an applicant for admission." Applicants for admission are among the individuals who can be placed in expedited removal, in which case they are subject to mandatory detention. INA § 235(b)(1)(B)(i)(IV).

31. If an applicant for admission is not placed in expedited removal proceedings under INA § 235 or is later placed in removal proceedings under INA § 240, detention is no longer mandatory. In these cases, noncitizens are sometimes released from custody and allowed to remain in the United States for the duration of their proceedings. 8 U.S. Code § 1226 (a).

32. However, where an individual who was placed in proceedings as an arriving alien is released into the United States, and is later detained for a different reason, the Immigration Courts have refused to claim jurisdiction over their custody redetermination. 8 CFR § 1003.19 (h)(1)(i)(B); *see also Matter of X-K-*, 23 I&N, Dec. 731 (BIA 2005) ("There is no question that Immigration Judges lack jurisdiction over arriving aliens who have been placed in section 240 removal proceedings, because they are specifically listed at 8 C.F.R. § 1003.19(h)(2)(i)(B) as one of the excluded categories.").

(ECF No. 1 at 7-8).

Rosado also asserts:

… [She] has been living in the United States for more than six years prior to her detention, and the reason for her current detention is not related to her first detention as an "applicant for admission." In the present case, there is not the issue of a continued detention of someone who is trying to enter the country, but rather a new detention – on a new warrant – for someone who has been in the country for over six years.

41. In fact, *the Notice of Custody Determination issued by the Department of Homeland Security states that the Petitioner was detained under Section 236 of the Immigration and Nationality Act. The document clearly shows that Petitioner is detained under 1226(a).*

42. Unfortunately, Immigration Courts have refused to claim jurisdiction over individuals in Petitioner's situation, allowing them to be detained indefinitely without the opportunity to at least have their custody decision reviewed by an immigration judge. 8 CFR § 1003.19(h)(1)(i)(B);  *see also Matter of X-K-*, 23 I&N, Dec. 731 (BIA 2005). There is a complete lack of reasonableness by the Immigration Courts in failing to differentiate those considered to be "arriving aliens," which the statute refers to as noncitizens coming through the border, and noncitizens who have been in the U.S. for several years who are now being detained for separate reasons based on the new presidential administration's anti-immigration policies. [footnote 4: Lauren Kaori Gurley, et. al., *ICE sets quotas to deliver on immigration crackdown on employers*, The Washington Post, June 11, 2025 …].

(ECF No. 1 at 10-11) (emphasis added).

Respondents assert the IJ properly denied jurisdiction to release Rosado on bond or otherwise because the IJ determined she was an "arriving alien." (ECF No. 11 at 3, citing 8 CFR § 1001.1(q)).[5] Respondents assert:

Here, Petitioner is an arriving alien subject to mandatory detention under 8 U.S.C. § 1225(b)(2)(A), and that detention throughout the remainder of her proceedings is lawful. Petitioner is currently in removal proceedings but does not have a final removal order issued against her. Noncitizens in pre-final-removal-order civil immigration detention generally fall within two categories: 8 U.S.C. § 1225, which consists of noncitizens seeking an initial entry, and 8 U.S.C. § 1226, which consists of noncitizens who entered the United States. Petitioner falls under 8 U.S.C. § 1225 because she was found to be an inadmissible arriving alien, even though, for discretionary reasons, she was released from custody. The difference between the noncitizens in these two categories is significant for due process purposes. *See Thuraissigiam*, 591 U.S. at 106-07, 138-40; *Mendoza-Linares v. Garland*, 51

_____

[5] The term arriving alien means an applicant for admission *coming* or *attempting to come* into the United States *at a port-of-entry*, or an alien seeking transit through the United States at a port-of-entry, or an alien interdicted in international or United States waters and brought into the United States by any means…. An arriving alien remains an arriving alien even if paroled pursuant to section 212(d)(5) of the Act, and even after any such parole is terminated or revoked….

8 C.F.R. § 1001.1(q) (emphasis added).

F.4th 1146, 1148 (9th Cir. 2022) (noting the "unique constitutional status of arriving aliens with no ties to the United States").

The Supreme Court considered whether 8 U.S.C. § 1225(b) imposes a time-limit on the length of detention and whether such noncitizens detained under this statutory authority have a statutory right to a bond hearing. *See Jennings*, 583 U.S. at 296-303. The Supreme Court held that "nothing in the statutory text [of 8 U.S.C. § 1225(b)] imposes any limit on the length of detention" nor "says anything whatsoever about bond hearings." *Id.* at 842. The sole means of release for noncitizens detained pursuant to 8 U.S.C. § 1225(b) is temporary parole at the discretion of DHS under 8 U.S.C. § 1182(d)(5). *Id.* at 844.

(ECF No. 11 at 3-4).

Notably, Respondents state that Rosado was held in custody and then "released from custody" "for discretionary reasons," but do not specify under what statute or regulation Rosado was released into the United States. Additionally, Respondents cite *Mendoza-Linares* with regard to "arriving aliens with no ties to the United States," without qualifying that upon Rosado's release from custody in 2018, when it was determined she was not subject to expedited removal, she had an address in Massachusetts which has likely been her residence for the more than six years she has been in the United States, and that during these years Rosado has presumably developed additional ties to the United States.

Upon inspection at the time of her request for admission through a port of entry Rosado was initially detained and then released, at the Deportation Officer's discretion, into the United States. There is no evidence before the Court that Rosado was formally "paroled" into the United States, although it appears that Rosado was conditionally paroled. A Deportation Officer gave Rosado a Notice to Appear prior to her release into the United States. Rosado was not taken into custody at the time of the hearing scheduled in the Notice to Appear. Rosado was in removal proceedings, but not under an order of removal, when she filed an application for asylum and withholding of removal in 2022, and she was not taken into custody at that time. Given this set of circumstances, despite the oft-cited legal "fiction" that one who has deemed inadmissible into the United States has not "entered" the United States and "stands at the gates" seeking admission to the United States, Rosado

has indeed "entered" the United States. Although Rosado was deemed inadmissible based on her lack of a valid entry document in 2018, she has nonetheless been in the United States for a period of years, after inspection through a port of entry and release from custody into the United States with the government's acquiescence. Rosado's presence in the United States has been well-known to the government. Rosado is not alleged to have become a burden to the government and she has committed no crime. *See Arizona v. United States,* 567 U.S. 387, 407 (2012) ("As a general rule, it is not a crime for a removable alien to remain present in the United States.").

### III.    Analysis

Habeas corpus relief extends to a person in the custody of the United States. *See* 28 U.S.C. § 2241. Relief is available if such a person is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3).

### A.    United States Statutes Governing Custody of Noncitizens

As the Ninth Circuit has observed, "divining [the] meaning ... of [t]he complex provisions of the [Immigration and Naturalization Act] ... is ordinarily not for the faint of heart." *Torres v. Barr*, 976 F.3d 923, 930 (9th Cir. 2020).

The INA established the statutory framework governing noncitizens' entry into, presence in, and removal from the United States, and the regulations promulgated by the enforcing agencies provide specific procedures for classification of noncitizens. When a noncitizen arrives at the border seeking entry into the United States, they are deemed an "applicant for admission." The INA established many categories of "inadmissibility." Noncitizens who arrive at a port of entry without a visa or other entry document, like Rosado, may be deemed "inadmissible" pursuant to 8 U.S.C. § 1182(a)(7).

When a noncitizen is deemed inadmissible under § 1182(a)(7), the immigration officer must order the noncitizen's removal unless the noncitizen indicates an intention to apply for asylum or fear of persecution. *See* 8 U.S.C. § 1225(b)(A)(ii). The noncitizen may be placed in "expedited removal" proceedings, which contain a truncated asylum process and require that the noncitizen remain detained throughout the process. *See id.*

1    § 1225(B)(iii). Alternatively, the noncitizen may be placed in removal proceedings
2    pursuant to 8 U.S.C. § 1229a, by being given a Notice to Appear pursuant to 8 U.S.C.
3    § 1229.

4         There is no record evidence that in 2018 Rosado was detained at the border pursuant
5    to a claim for asylum after a credible fear interview, or that she was paroled into the United
6    States. At the border Rosado was detained but not placed into expedited removal
7    proceedings nor was her detention continued pending the outcome of expedited removal
8    proceedings or an application for asylum. The record demonstrates that in October of 2018
9    Rosado was placed in removal proceedings pursuant to 8 U.S.C. § 1229 by being given a
10   Notice to Appear. Because Rosado was placed into removal proceedings pursuant to
11   § 1229, an alternative process to that stated in § 1225, her release in 2018 and her current
12   detention are pursuant to § 1226, not § 1225. This conclusion is supported by the fact that
13   the Deportation Officer ordering Rosado detained on April 30, 2025, cited INA § 236, i.e.,
14   8 U.S.C. § 1226. (ECF No. 1-1 at 2).

15        Respondents' theory of Rosado's status, i.e., that she is subject to mandatory
16   detention under § 1225, does not comport with the procedural history of her release into
17   the United States in 2018, her continued non-detention after the Notice to Appear hearing
18   in 2018, and her continued non-detention throughout her continued presence in the United
19   States through April 30, 2025. The only exception permitting the release of aliens detained
20   under § 1225(b) is the parole authority provided by § 1182(d)(5)(A). Parole into the United
21   States employs a legal fiction whereby noncitizens are physically permitted to enter the
22   country but are nonetheless "treated," for legal purposes, "as if stopped at the border."
23   *Department of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 139 (2020), *quoting*
24   *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 215 (1953). Noncitizens paroled
25   into the United States are in a fundamentally different and less protected position than
26   "those who are within the United States after an entry, irrespective of its legality." *Leng*
27   *May Ma v. Barber*, 357 U.S. 185, 187 (1958). Individuals detained as inadmissible upon
28   inspection at the border can only be paroled into the United States "'for urgent

humanitarian reasons or significant public benefit.'" *Jennings v. Rodriguez*, 583 U.S. 281, 300 (2018), *quoting* 8 U.S.C. § 1182(d)(5)(A). Because there is no record finding that Rosado was released into the United States for urgent humanitarian reasons or significant public benefits, her "discretionary" release must be construed as conditional parole, or release on recognizance.

Release on recognizance, which Respondents construe as "discretionary" release, is not a form of "parole into the United States" based on "humanitarian" grounds or "public benefit," but rather a form of "conditional parole" from detention upon a charge of removability, authorized by 8 U.S.C. 1226(a)(2)(B).[6] *See Ortega-Cervantes v. Gonzales*, 501 F.3d 1111, 1115-16 (9th Cir. 2007) (holding a non-citizen released on an "Order of Release on Recognizance" must necessarily have been detained and released under § 1226, *inter alia* because they were not an "arriving alien" under the regulations governing § 1225). The distinction between parole pursuant to § 1225 and conditional parole pursuant to § 1226 reflects more than an immigration officer's choice of paperwork because, although both forms of relief are styled as "parole," these two mechanisms serve fundamentally different purposes. Parole "into the United States" under § 1182(d)(5)(A), permits a non-citizen to physically enter the country, subject to a reservation of rights by the government that it may continue to treat the non-citizen "as if stopped at the border." *Thuraissigiam*, 591 U.S. at 139. Conditional parole provides a mechanism of release on recognizance, without payment of a bond, at the discretion of the government *See Rivera v. Holder*, 307 F.R.D. 539, 553 (W.D. Wash. 2015) ("§ 1226(a) unambiguously states that

---

[6] 8 U.S.C.A. § 1226 provides:
(a) Arrest, detention, and release
On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) and pending such decision, the Attorney General--
    (1) may continue to detain the arrested alien; and
    (2) may release the alien on--
        (A) bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or
        (B) conditional parole …

an IJ may consider conditions for release beyond a monetary bond. Plaintiff's IJ mistakenly believed he had no such authority, a misunderstanding that conflicted with the law."). Notably, release on conditional parole is not deemed as being paroled into the United States with the attached reservation of rights by the government, but instead this status "provides a mechanism whereby an alien may be released pending the determination of removal, as long as she is not a 'danger to persons or property' and 'is likely to appear for any further proceeding.'" *Delgado-Sobalvarro v. Attorney Gen. of U.S.*, 625 F.3d 782, 787 (3d Cir. 2010). *See also Matter of Castillo-Padilla*, 25 I.&N. Dec. 257, 261 (B.I.A. 2010).

Thus, the record before the Court regarding Rosado's lack of detention during her removal proceedings beginning in 2018, after inspection at the border, through April 30, 2025, can only be construed as demonstrating that Rosado was conditionally paroled into the United States. *See Matter of Cabrera-Fernandez*, 28 I.&N. Dec. 747, 749 (B.I.A. 2023) (holding an immigration judge erred in treating release on recognizance of noncitizens "detained soon after their unlawful entry" as constructive humanitarian parole where the government had not followed the "procedures for parole under [section 1182(d)(5)]"). *See also Ortega-Cervantes*, 501 F.3d at 1115-16; *Martinez v. Hyde*, ___ F. Supp. 3d ___, No. CV 25-11613, 2025 WL 2084238, at *3-4 (D. Mass. July 24, 2025).

None of the documents issued to Rosado or presented to the Court makes any reference to Rosado having been "paroled" into the United States, although she was clearly released into the United States after inspection, after being found inadmissible, and her release was continued after her Notice to Appear hearing and after she filed her application for asylum and withholding of removal. Indeed, given the fact Rosado was "present in the United States" long before she was taken into custody a second time in 2025 (the first time being at the border in 2018), *see Ortega-Cervantes*, 501 F.3d at 1115, it would make little sense to talk about admitting her into the United States or allowing her to "enter" the United States in 2025; she was already here and had been for some years, and she was here with the knowledge and approval of the Department of Homeland Security. In contrast to § 1225, § 1226 governs a separate (non-mandatory) detention scheme applicable when a

noncitizen is "already in the country." *Jennings*, 583 U.S. at 289. Section 1226(a) clearly provides that the Attorney General or their representative "may release" a noncitizen who is inadmissible on "bond … or conditional parole." 8 U.S.C. § 1226(a)(1)-(2).

Therefore, because Rosado's presence in the United States after her inspection and release into the United States in October of 2018, and after her Notice to Appear hearing, has been on de facto conditional parole pursuant to § 1226, the IJ's 2025 determination that they were without jurisdiction to reconsider Rosado's detention, and Rosado's detention itself in the absence of a hearing as to whether she is a danger to persons or property and whether she is likely to appear for any further proceeding, are contrary to the laws of the United States.

Moreover, the statutory history of the subject statutes and the canons of statutory construction also provide that Rosado's status prior to her most recent detention was that of a noncitizen in removal proceedings, deemed inadmissible pursuant to INA § 212(a)(7)(A)(i)(I), who was seeking relief from removal, and who was present pursuant to § 1226.

Section 1225(a)(1) states that a noncitizen in the United States who has not been admitted "shall be deemed for purposes of this chapter an applicant for admission." Section 1225(b)(2)(A) states that in the case of a noncitizen "who is an applicant for admission, if the examining immigration officer determines" the noncitizen seeking admission "is not clearly and beyond a doubt entitled to be admitted," the noncitizen "shall be detained for a proceeding under section 1229a of this title." Respondents assert these texts require that *all* inadmissible noncitizens present in the United States be detained pending the finality of their removal proceedings, regardless of any prior release with the government's acquiescence during the pendency of their removal proceedings.

Adoption of Respondents' position would render significant portions of 8 U.S.C. § 1226 meaningless. One of the most basic canons governing the interpretation of federal statutes provides that  a statute "should be construed so that effect is given to all its provisions, so that no part will be  inoperative or superfluous, void or insignificant …"

*Corley v. United States*, 556 U.S. 303, 314 (2009) (internal quotations omitted); *Shulman v. Kaplan*, 58 F.4th 404, 410-11 (9th Cir. 2023). "This principle ... applies to interpreting any two provisions in the U.S. Code, even when Congress enacted the provisions at different times." *Bilski v. Kappos*, 561 U.S. 593, 607-08 (2010). If Respondents' interpretation of § 1225 is correct and this section's mandatory detention provisions apply to all noncitizens present in the United States who have not been admitted, it would render superfluous provisions of § 1226 that apply to certain categories of inadmissible noncitizens. *See* § 1226(c)(1)(A), (D), (E)**;** *Shulman*, 58 F.4th at 410-11; *Torres*, 976 F.3d at 930. Under Respondents' proposed interpretation, § 1226(c)(1)(E)'s mandated detention for inadmissible noncitizens who are implicated in an enumerated crime, including those "present in the United States without being admitted or paroled," would be meaningless and superfluous because "all noncitizens who have not been admitted" would already be governed by § 1225's mandatory detention authority. *See Shulman*, 58 F.4th at 410-11. *See also Corley*, 556 U.S. at 314, n.5 (explaining that seemingly conflicting statutes read in isolation can be reconciled if read in their broader context, which includes observing the "antisuperflousness" canon).

The Supreme Court's opinion in *Jennings* also supports the harmonizing of § 1225 and § 1226 contrary to Respondents' proposition. The *Jennings* Court framed § 1225 as part of a process that "generally begins at the Nation's borders and ports of entry, where the Government must determine whether a [noncitizen] seeking to enter the country is admissible." 583 U.S. at 287. The *Jennings* Court then describes § 1226 as governing "the process of arresting and detaining" noncitizens who are living "inside the United States" but "may still be removed," including noncitizens "who were inadmissible at the time of entry." *Id.* at 288. The Court summarized the distinction as follows: "…U.S. immigration law authorizes the Government to detain certain [noncitizens] seeking admission into the country under §§ 1225(b)(1) and (b)(2). It also authorizes the Government to detain certain [noncitizens] already in the country pending the outcome of removal proceedings under §§ 1226(a) and (c)." *Id.* at 289.

Notably, some of the exceptions in § 1226(c) that would be made superfluous by the Respondents' reading of the two sections were recently enacted by Congress in the Laken Riley Act ("LRA"). "When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect." *Stone v. Immigration & Naturalization Serv.*, 514 U.S. 386, 397 (1995) (citations omitted) (giving effect to a congressional amendment of the INA). Congress passed the LRA in January of 2025, amending several provisions of the INA including sections 1226 and 1225. *See* LRA, Pub. L. No. 119-1, 139 Stat. 3 (2025). Relevant to the instant matter, the LRA carved out an additional category of noncitizens from § 1226(a)'s discretionary detention scheme, who now fall under § 1226(c)'s mandatory detention authority. *Id.* This "new" category includes those noncitizens who are deemed inadmissible, including for being "present in the United States without being admitted or paroled," and who have been arrested, charged with, or convicted of certain crimes. 8 U.S.C. § 1226(c)(1)(E); LRA, Pub. L. No. 119-1. These "specific exceptions" for inadmissible noncitizens who are arrested, charged with, or convicted of the enumerated crimes logically leaves those inadmissible noncitizens not criminally implicated subject to § 1226(a)'s default rule for discretionary detention. *See Jennings*, 583 U.S. at 289; *Shady Grove Orthopedic Assocs., P.A., v. Allstate Ins. Co.*, 559 U.S. 393, 400 (2010).

Additionally, Congress enacted the LRA against the backdrop of longstanding agency practice applying § 1226(a) to inadmissible noncitizens already residing in the country. Another "customary interpretive tool" is the principle that "[w]hen Congress adopts a new law against the backdrop of a 'longstanding administrative construction,'" the federal courts should "generally presume[] the new provision should be understood to work in harmony with what has come before." *Monsalvo Velazquez v. Bondi*, 604 U.S. ___, 145 S. Ct. 1232, 1242 (2025), *quoting Haig v. Agee*, 453 U.S. 280, 297-298 (1981). In *Monsalvo Velazquez* the Supreme Court recognized that when a subject statute is "susceptible" to more than one "understanding[]," the federal courts should adopt an interpretation "consistent" with the "longstanding administrative construction" of the

subject statute. *Id.* Congress adopted the new LRA amendments to § 1226(c) against the backdrop of decades of agency practice applying discretionary detention under § 1226(a) to inadmissible noncitizens such as Rosado. Therefore, Congress presumably intended "the same understanding" of the extant statute as was previously practiced by the agency. *Id.*

The legislative history behind § 1226 also supports the argument that it governs noncitizens, like Rosado, who were deemed inadmissible upon inspection at the border, released into the United States at the border after being placed into removal proceedings, and were present in the United States for a number of years prior to being taken into detention. Before passage of the Immigration Reform and Immigrant Responsibility Act ("IRIRA"), the predecessor statute to § 1226(a) governed deportation proceedings for all noncitizens arrested within the United States. *See* 8 U.S.C. § 1252(a)(1) (1994) ("Pending a determination of deportability ... any [noncitizen] ... may, upon warrant of the Attorney General, be arrested and taken into custody."); *Hose v. Immigration & Naturalization Serv.*, 180 F.3d 992, 994 (9th Cir. 1999) (noting a "deportation hearing" was the "usual means" of proceeding against an alien physically in the United States). The predecessor statute, like § 1226(a), included a provision allowing for discretionary release on bond. *See* 8 U.S.C. § 1252(a)(1) (1994). After passing the IIRIRA, Congress declared the new § 1226(a) "restates the current provisions in [the predecessor statute] regarding the authority of the Attorney General to arrest, detain, and release on bond" a noncitizen "who is not lawfully in the United States." H.R. Rep. No. 104-469, pt. 1, at 229. *See also* H.R. Rep. No. 104-828, at 210. Because noncitizens like Rosado were entitled to discretionary detention under § 1226(a)'s predecessor statute, and Congress declared the statute's scope unchanged by IIRIRA, the Court should interpret § 1226 to allow for a discretionary release on bond for noncitizens in a situation similar to Rosado.

Respondents' proposed application of § 1226 is also belied by the Department of Homeland Security's "longstanding practice" of treating noncitizens taken into custody while living in the United States, including those detained and found inadmissible upon inspection and then released into the United States with the government's acquiescence,

who have committed no crime after release, as detained under § 1226(a). *See Loper Bright Enter. v. Raimondo*, 603 U.S. 369, 386 (2024). "[T]he longstanding practice of the government—like any other interpretive aid—can inform [a court's] determination of what the law is." *Id.* (internal quotations omitted, second brackets in original). The Supreme Court has observed that respect for the executive branch's interpretations of federal statutes is "especially warranted when [the interpretation] was issued roughly contemporaneously with enactment of the statute and remained consistent over time." *Id.* This is particularly so with regard to the present circumstance, when an individual, who has been present in the United States with the government's acquiescence for a number of years, has been subjected to an infringement of their liberty interest, as discussed *infra*, for no other reason than a regime change's desire to expel a large number of non-criminal noncitizens as quickly as possible under whatever conditions it deems warranted.

In a 1997 interim rule issued "to implement the provisions of [IIRIRA]," which had passed six months earlier, the executive branch agencies charged with enforcing the nation's immigration laws directly addressed the detention scheme regarding noncitizens. *See* Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997). Under the heading "Apprehension, Custody, and Detention of Aliens," the agencies (the Immigration and Naturalization Service and the Executive Office for Immigration Review) first stated that IIRIRA dictated a new $1,500 minimum bond amount for "non-criminal aliens" *Id.* In the following sentence, the agencies explained that "[d]espite being applicants for admission, aliens who are present without having been admitted or paroled (formerly referred to as aliens who entered without inspection) will be eligible for bond and bond redetermination." *Id.* This guidance reflects the executive branch's reconciliation of the ambiguous and seemingly conflicting provisions of sections 1225 and 1226. *See Corley*, 556 U.S. at 314 n.5. Although not subject to deference, this statement of purpose and the agencies' subsequent years of unchanged practice is persuasive as to the correct interpretation and application of these statutes. *See Loper*

1    *Bright*, 603 U.S. at 386. *See also Biden v. Texas*, 597 U.S. 785, 805 (2022) (noting that

2    "[s]ince IIRIRA's enactment 26 years ago, every Presidential administration has

3    interpreted" § 1225(b) the same).

4        The text of § 1226, the canons of statutory interpretation, this section's legislative

5    history, and longstanding agency practice indicate that Rosado is subject to § 1226(a)'s

6    "default" rule for discretionary detention rather than § 1225's mandatory detention

7    requirement, and that the IJ erred by finding they did not have jurisdiction to consider

8    Rosado's detention.

9        The following is a well-reasoned and thoughtful explanation of why Respondents'

10   contention that Rosado's detention is mandatory should be rejected:

11       Under section 1225, "applicant" is a term of art including all non-
12       citizens "present in the United States who ha[ve] not been admitted."
         8 U.S.C. 1225(a)(1). Thus, it is Respondents' position that *virtually every*
13       *non-citizen not previously admitted to the United States is subject to*
         *mandatory detention, without the possibility of a bond hearing, regardless of*
14       *how long or under what circumstances that person has maintained a*
         *presence in the United States*.[footnote 8: For example, in *Rodriguez v.*
15       *Bostock*, —— F. Supp. 3d ——, 2025 WL 1193850 (W.D. Wash. Apr. 24,
         2025), the Government unsuccessfully argued that a grandfather who had
16       lived in the United States for more than fifteen years and who had never been
17       charged with a crime was properly detained without the possibility of a bond
         hearing under section 1225(b)(2)(A). *Id.* …].
18
         It is worth noting that such an approach would upend decades of
19       practice. *Indeed, mandatory detention for all applicants has only been the*
20       *official policy of the Department of Homeland Security ("DHS") for a few*
         *weeks, since July 8, 2025, when Acting Director of U.S. Immigration and*
21       *Customs Enforcement, Todd M. Lyons, issued an internal memorandum*
22       *explaining that the agency had "revisited its legal position*:"
         [footnote 10: The existence of the memorandum was first reported by the
23       Washington Post on July 14, 2025. Maria Sacchetti & Carol D. Leonnig, ICE
24       declares millions of undocumented immigrants ineligible for bond hearings
         … The memorandum itself was subsequently leaked by legal advocacy
25       groups. … The admitted novelty of the Government's legal argument may
         shed some light on why the Petitioner and Court had such a difficult time
26       recognizing it at first blush.] *DHS, in coordination with the Department of*
27       *Justice (DOJ), has revisited its legal position on detention and release*
28       *authorities. DHS has determined that [section 1225] of the Immigration and*

*Nationality Act (INA), rather than [section 1226], is the applicable immigration detention authority for all applicants for admission.*

It has been estimated that this novel interpretation would require the detention of *millions of immigrants* currently residing in the United States.

But Respondents' selective reading of the statute—which ignores its "seeking admission" language—violates the rule against surplusage and negates the plain meaning of the text. *See United States, ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 432 (2023) ("'[E]very clause and word of a statute' should have meaning."), *quoting Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883); *United States v. Abbas*, 100 F.4th 267, 283 (1st Cir. 2024) ("'We begin, as always, with the text of the statute' and read it 'according to its plain meaning at the time of enactment,'" *quoting United States v. Winczuk*, 67 F.4th 11, 16 (1st Cir. 2023) (internal quotation marks removed)), *cert. denied*, 145 S. Ct. 319 (2024). Here, the phrase "seeking admission" is undefined in the statute but necessarily implies some sort of present-tense action. *See Matter of M-D-C-V-*, 28 I.&N. Dec. 18, 23 (B.I.A. 2020) ("The 'use of the present progressive, like use of the present participle, denotes an ongoing process,'" *quoting Al Otro Lado v. Wolf*, 952 F.3d 999, 1011-12 (9th Cir. 2020)).

Petitioner's Notice to Appear *indicates no such action. Notably, the issuing officer appears to have explicitly declined to designate Petitioner as an "arriving alien," which is the active language used to define the scope of section 1225(b)(2)(A) in its implementing regulation*. 8 C.F.R. § 235.3(c)(1) ("Except as otherwise provided in this chapter, *any <u>arriving alien</u> who appears to the inspecting officer to be inadmissible, and who is placed in removal proceedings pursuant to section [1229a] shall be detained in accordance with section [1225(b)].*") (emphasis added).

*Martinez v. Hyde*, ___ F. Supp. 3d___, No. CV 25-11613, 2025 WL 2084238, at *4-6 (D. Mass. July 24, 2025) (emphasis added).

## B.    Procedure and Substantive Due Process

The Due Process Clause prohibits deprivations of life, liberty, and property without due process of law. U.S. Const. amend. V. It is firmly established that these protections extend to noncitizens present in the United States. *E.g.*, *Trump v. J.G.G.*, 604 U. S. ___, 145 S. Ct. 1003, 1006 (2025) (per curiam) ("'It is well established that the Fifth Amendment entitles aliens to due process of law' in the context of removal proceedings," *quoting Reno v. Flores*, 507 U.S. 292, 306 (1993)); *Zadvydas v. Davis*, 533 U.S. 678, 693, (2001) ("[T]he Due Process Clause applies to all 'persons' within the United States,

including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."); *Wong Wing v. United States*, 163 U.S. 228, 238 (1896) ("It must be concluded that all persons within the territory of the United States are entitled to the protection guarantied by [the Fifth Amendment], and that even aliens shall not ... be deprived of life, liberty, or property without due process of law."); *Hussain v. Rosen*, 985 F.3d 634, 642 (9th Cir. 2021) (holding the "Fifth Amendment entitles aliens to due process of law in deportation proceedings."); *Lopez v. Heinauer*, 332 F.3d 507, 512 (8th Cir. 2003) ("The Supreme Court has long recognized that deportable aliens are entitled to constitutional protections of due process."), *citing Yamataya v. Fisher*, 189 U.S. 86, 100-01 (1903). " "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty [the Due Process Clause] protects." *Zadvydas*, 533 U.S. at 690. Even those who face significant constraints on their liberty or those over whose liberty the government wields significant discretion retain a protected interest in their liberty. *See Ortega v. Bonnar*, 415 F. Supp. 3d 963, 970 (N.D. Cal. 2019) ("The fact that a decision-making process involves discretion does not prevent an individual from having a protectable liberty interest."), *citing Young v. Harper*, 520 U.S. 143, 150 (1997). And the "essence" of procedural due process is that a person risking a serious loss be given notice and an opportunity to be heard in a meaningful manner and at a meaningful time. *E.g.*, *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976).

Respondents contend Rosado's only due process right is a right to the procedure provided by the relevant statutes, i.e., they argue that Rosado is not entitled to any process at all because her detention is mandatory as required by § 1225. In addition to the conclusion stated *supra* that Rosado's detention is not mandatory, there is certainly room for argument that Rosado has the same due process right as a United States citizen with regard to the deprivation of liberty without an opportunity to be given notice and an opportunity to be heard prior to such deprivation.

> Were it true that "arriving" noncitizens have no due process rights, it would mean that such individuals—including those living freely among us on parole—could "be subjected to the punishment of hard labor without a

judicial trial." *Clerveaux*, 397 F. Supp. 3d at 316 (quoting *Zadvydas v. Davis*, 533 U.S. 678, 704 (2001) (Scalia, J., dissenting)). And it would mean that a noncitizen living here on parole could be taken into custody and beaten by local police without any violation of the Fourth Amendment. That cannot be the law.

*Mata Velasquez v. Kurzdorfer*, No. 25-CV-493, 2025 WL 1953796, at *16 (W.D.N.Y. July 16, 2025).

By statute and regulation, as interpreted by the Board of Immigration Appeals ("BIA"), ICE has the authority to re-arrest a noncitizen and revoke their release pending the outcome of removal proceedings only when there has been a change in circumstances since the individual's initial release. *See Panosyan v. Mayorkas*, 854 F. App'x 787, 788 (9th Cir. 2021) ("Thus, absent changed circumstances ... ICE cannot redetain Panosyan."); *Matter of Sugay*, 17 I&N Dec. 647, 640 (B.I.A. 1981). Additionally, any change in circumstances must be "material." *Saravia v. Barr*, 280 F. Supp. 3d 1168, 1197 (N.D. Cal. 2017), *aff'd sub nom. Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018). The Government's authority to arrest a noncitizen and revoke their release is also proscribed by the Due Process Clause because it is well-established that individuals released from incarceration have a liberty interest in their freedom. To protect that interest, due process requires notice and a hearing, prior to any re-arrest, at which hearing the individual is afforded the opportunity to advance their arguments as to why their release should not be revoked. This most basic American principle—that individuals placed at liberty are entitled to process before the government reimprisons them—has particular meaning here, where Rosado's detention was already found, in 2018, to be unnecessary.

Although ICE has the initial discretion to detain or release a noncitizen pending removal proceedings, after that individual is released from custody they have a protected liberty interest in remaining out of custody. *See Ortega*, 415 F. Supp. 3d at 969 ("Just as people on preparole, parole, and probation status have a liberty interest, so too does [a noncitizen released from immigration detention] have a liberty interest in remaining out of custody on bond."); *Romero v. Kaiser*, No. 22-cv-02508, 2022 WL 1443250, at *2 (N.D.

Cal. May 6, 2022) ("[T]his Court joins other courts of this district facing facts similar to the present case and finds Petitioner raised serious questions going to the merits of his claim that due process requires a hearing before an IJ prior to re-detention."); *Jorge M. F. v. Wilkinson*, No. 21-cv-01434, 2021 WL 783561, at *2 (N.D. Cal. Mar. 1, 2021).[7]

Rosado's re-detention, after six years of being released on recognizance from an initial detention on inspection, was without prior notice, a showing of changed circumstances, or a meaningful opportunity to object, and therefore she was not afforded the procedural requirements of the Fifth Amendment. *See*, *e.g.*, *Rosales-Garcia v. Holland*, 322 F.3d 386, 409 (6th Cir. 2003) ("Excludable aliens—like all aliens—are clearly protected by the Due Process Clauses of the Fifth and Fourteenth Amendments."), *citing Yick Wo v. Hopkins*, 118 U.S. 356 (1886).

The Court should interpret the Due Process Clause protections afforded a noncitizen consistent with the longstanding precedent recognizing these protections must be balanced with the government's countervailing interests in immigration enforcement. To determine whether civil detention violates a detainee's right to liberty the federal courts apply the three-part test set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976). *See Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1206 (9th Cir. 2022); *Hernandez v. Sessions*, 872 F.3d 976, 993 (9th Cir. 2017); *Hernandez-Lara v. Lyons*, 10 F.4th 19, 27 (1st Cir. 2021); *Velasco Lopez v. Decker*, 978 F.3d 842, 851 (2d Cir. 2020). *Mathews* requires consideration of (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. at 335.

---

[7] The government's appeal of the Northern District of California's decision in *Ortega* to the Ninth Circuit Court of Appeals was voluntarily dismissed. *See Ortega v. Bonnar*, No. 20-15754, 2021 WL 1590193 (9th Cir. Jan. 15, 2021).

**1. "[T]he private interest that will be affected by the official action**"

The private interest affected by the official action in this matter is the most sacred and profound right afforded by the United States Constitution, i.e., the right to liberty, to one's personal freedom, to be free from being placed in a de facto cage without having committed any crime or otherwise violated or abused any agreement with or privilege afforded by the government. Additionally, the conditions of Rosado's detention further tip this first factor in her favor. When assessing this factor, courts consider the conditions under which detainees are currently held, including whether a detainee is held in conditions indistinguishable from criminal incarceration. *See Hernandez-Lara*, 10 F.4th at 28 (involving a noncitizen detainee held "alongside criminal inmates" at a county jail); *Velasco Lopez*, 978 F.3d at 852 (observing a noncitizen was "not detained" but, rather, was incarcerated in conditions identical to those imposed on criminal defendants). *See also Gunaydin v. Trump*, ___ F. Supp. 3d ___, No. 25-CV-01151, 2025 WL 1459154, at *8 (D. Minn. May 21, 2025).

Rosado is detained at the CoreCivic immigration detention facility in Eloy, Arizona. The Eloy facility opened in 1994 and was designed to imprison people in criminal custody. *See* U.S. DEP'T OF HOMELAND SEC., IMMIGR. & CUSTOMS ENFORCEMENT OFF. OF PRO. RESP., INSPECTIONS, & DETENTION OVERSIGHT, OFF. OF DETENTION OVERSIGHT COMPLIANCE INSPECTION, ENFORCEMENT & REMOVAL OPERATIONS, PHX. FIELD OFF., ELOY DET. CENTER (2013), *available at*: https://www.ice.gov/doclib/foia/odo-compliance-inspections/eloyDetentionCenterEloyAzNov5_7_2013.pdf.    (last    visited August 11, 2025). The facility has since evolved into an ICE detention facility. Concerns have been raised with regard to the conditions of confinement at the Eloy Detention Center.

> Between August 2022 and May 2023, [the Office for Civil Rights and Civil Liberties] opened 11 complaint investigations involving noncitizens in ICE custody at Eloy. The allegations raised concerns related to medical care, *excessive lockdowns*, unsanitary living conditions, inadequate access to showers and recreation, and unhygienic food service operations. As a result of these complaints, CRCL conducted a multidisciplinary investigation at Eloy in September 2023 to examine the facility and assess issues raising civil rights and civil liberties concerns .Findings and Recommendations On April

4, 2024, CRCL issued ICE an Onsite Recommendation Memorandum based on its investigation conducted with the assistance of contract subject matter experts. *The memo included 24 recommendations in the general areas of conditions of detention, medical care, mental health care, and environmental health and safety.*

U.S. DEP'T OF HOMELAND SEC., OFF. FOR CIVIL RIGHTS & CIVIL LIBERTIES, SUMMARY OF CRCL'S RECOMMENDATIONS & ICE'S RESPONSE, ELOY DET. CENTER (2024), *available at*: https://www.documentcloud.org/documents/25866584-24-1216-crcl-close-summary-ice-eloy-detention-center-508/#document (last visited August 11, 2025) (emphasis added).

**2. "[T]he risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"**

The process afforded Rosado by the Eloy IJ regarding her custody was not a hearing on the merits—the IJ concluded they did not have jurisdiction to release Rosado on bond, an incorrect interpretation of the relevant statutes as discussed *supra*. Rosado was not afforded any hearing, or procedural safeguards, that balanced her protected liberty interest with the government's interest in immigration enforcement. The Ninth Circuit has held that when there is a substantial liberty interest at stake, the government should have the burden of proving, by clear and convincing evidence, that an individual is a danger or flight risk before depriving the individual of their liberty. *See Singh v. Holder*, 638 F.3d 1196, 1203-04 (9th Cir. 2011). Had Rosado been given a hearing on her detention it is likely she could have established her release was required because there were no "changed circumstances" warranting her detention. However, at this time, it is unlikely that any additional procedural measures conducted by the same agency would protect Rosado's interests. It is noted that Rosado's master hearing has been expedited by not quite a year, to August 14, 2025; any decision of the BIA regarding Rosado's appeal of the IJ's decision on her current detention would come after a decision in all likelihood ordering her removal and denying withholding of removal, in which circumstance an appeal from the IJ's prior decision will be moot.

**3. "[T]he Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail"**

Civil detention comports with due process only when a "special justification" outweighs the "individual's constitutionally protected interest in avoiding physical restraint." *Zadvydas*, 533 U.S. at 690. The government has not identified any new information specific to Rosado's circumstances to undermine its own prior determination that she does not pose a danger or a flight risk if allowed to remain at large in the population during her removal proceedings. *See Saravia*, 280 F. Supp. 3d at 1176  ("Release reflects a determination by the government that the noncitizen is not a danger to the community or a flight risk."); *Valdez v. Joyce*, No. 25-CV-4627, 2025 WL 1707737 at *3 & n.6 (S.D.N.Y. June 18, 2025) ("[T]he present allegation by ICE that Petitioner is at risk of flight is directly at odds with the contrary Department of Homeland Security ("DHS") decision to release Petitioner on his own recognizance…"). The government's only apparent interest in taking Rosado into custody, which actually places an additional fiscal and administrative burden on the government, is to fulfill a quota of arrests, i.e., 3,000 immigration arrests per day, set by the current administration. *See Vasquez Perdomo v. Noem*, ___ F. Supp. 3d ___, No. 2:25-cv-056050, 2025 WL 1915964, at *5 (C.D. Cal. July 11, 2025), *stay pending appeal denied*, 2025 WL 2181709 (9th Cir. Aug. 1, 2025).

Therefore, all of the factors stated in *Matthews* weigh in favor of finding Rosado's due process rights have been violated and ordering her release.

Respondents assert Rosado's detention is mandatory because she is an "inadmissible arriving alien subject to mandatory detention under 8 U.S.C. § 1225(b)(2)A) [sic]." However, because immigration detention is civil, it can have no punitive purpose. The government's only legitimate interests in holding an individual in immigration detention, at the expense of the federal taxpayer, can be to prevent danger to the community or to ensure the noncitizen's appearance at an immigration, i.e., removal proceeding. *See Zadvydas*, 533 U.S. at 690. With regard to Rosado, it is simply not

plausible that the government has any legitimate or compelling basis for detaining Rosado, who entered the United States for inspection through a port of entry, and was released at that time and continued to be released after appearing before an immigration court in 2018, and has since has lived at liberty at the same address in Massachusetts, without any criminal or civil infractions.

The public interest also weighs in Rosado's favor. "The public has a strong interest in upholding procedural protections against unlawful detention, and the Ninth Circuit has recognized that the costs to the public of immigration detention are staggering." *Diaz v. Kaiser*, No. 25-cv-05071, 2025 WL 1676854, at *3 (N.D. Cal. June 14, 2025), *citing Jorge M.F.*, 2021 WL 783561, at *3. *See also Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 838 (9th Cir. 2020) ("It is always in the public interest to prevent the violation of a party's constitutional rights.").

With regard to the holding in *Thuraissigiam*, cited by Respondents, in *Thuraissigiam* the Supreme Court held that a petitioner who was stopped at the border did not have any due process rights regarding admission into the United States. *Thuraissigiam*, 591 U.S. at 107. In contrast, the pending § 2241 petition does not challenge any determination regarding Rosado's admissibility into the United States, but instead involves a challenge to her detention pending the conclusion of her removal proceedings. *See Padilla v. ICE*, 704 F. Supp. 3d 1163, 1170-72 (W.D. Wash. 2023) (discussing *Thuraissigiam* and explaining the distinction between a challenge to admission and a challenge to detention). Additionally, it it is well-established that the Due Process Clause imposes a significant constraint on the manner in which the executive branch agencies may exercise their authority, "through detention or otherwise." *Hernandez*, 872 F.3d at 990 n.17. The Due Process Clause protects Rosado, a person present in the United States, from unlawful detention. *See Zadvydas*, 533 U.S. at 693.

In light of the deprivation of Rosado's liberty, initially granted and approved by the government, the absence of any deliberative process prior to or contemporaneous with the deprivation of her liberty, and the statutory and the constitutional rights implicated by her

1    current situation, a writ of habeas corpus is the only vehicle for relief. It is, in essence, the

2    most appropriate remedy. *See Ceesay v. Kurzdorfer*, ___ F. Supp. 3d ___ 2025 WL

3    1284720, at *1 (W.D.N.Y. May 2, 2025) ("while [DHS] might want to enforce this

4    country's immigration laws efficiently, it cannot do that at the expense of fairness and due

5    process."); *Valdez*, 2025 WL 1707737, at *3-4 (finding the "ongoing detention of [the

6    p]etitioner"—who had previously been "released ... on his own recognizance," "with no

7    process at all, much less prior notice, no showing of changed circumstances, or an

8    opportunity to respond, violates his due process rights," violated their right to due process);

9    *Lopez v. Sessions*, 2018 WL 2932726, at *12 (S.D.N.Y. June 12, 2018) (finding that "re-

10   detention [of noncitizen who arrived as a minor but subsequently reached the age of

11   majority], without prior notice, a showing of changed circumstances, or a meaningful

12   opportunity to respond, does not satisfy the procedural requirements of the Fifth

13   Amendment").

14   ## C.    Fourth Amendment Issue

15   Respondents do not clearly dispute that Rosado was not taken into custody under

16   the authority of a warrant for her arrest. Rosado contends that, pursuant to 8 U.S.C.

17   § 1357(a)(2), ICE officers may only conduct a warrantless arrest of a noncitizen if there is

18   > "reason to believe" that the potential arrestee (1) "is in the United States in
19   > violation of [an immigration] law or regulation" and (2) "is likely to escape
20   > before a warrant can be obtained for his arrest." *Nava v. Dep't of Homeland
21   > Sec.*, 435 F.Supp.3d 880, 885 (N.D. Ill. 2020). Mere presence within the
     > United States in violation of U.S. immigration law is not, by itself, sufficient
22   > to conclude that an alien is likely to escape before a warrant for arrest can be
     > obtained. *Id.*

23   (ECF No. 1 at 13).

24   Respondents assert that "immigration officers identified" Rosado "in her residence

25   after the Milford Police Department executed" a warrant for her son's arrest, and that

26   "[w]hen it was determined that Petitioner was an inadmissible alien without lawful status

27   in the United States," she was "taken into ICE custody. (ECF No. 11 at 2).

28

Respondents assert:

> In this case, ICE officers were notified about an arrest being made at Petitioner's home of an undocumented immigrant, Petitioner's son. [] The Milford Police had a valid warrant for Petitioner's son who was in the United States without status. *Id.* This provided them with reasonable suspicion that Petitioner, his mother, may also be in the United States without lawful status, and she identified herself as being in the United States without lawful status. *Id.* Her arrest and detention under these circumstances does not violate the Fourth Amendment.
>
> Indeed, the legality of an arrest of an alien based upon a civil immigration violation is well-established. *See Abel v. United States*, 362 U.S. 217, 230 (1960) ("Statutes authorizing administrative arrest to achieve detention pending deportation have the sanction of time.").
>
> The statute authorizing the warrantless arrest of an alien by an ICE officer does not expressly require probable cause but authorizes the arrest if the officer "has reason to believe" that the alien is in the United States in violation of a law governing admission or removal of aliens and is likely to escape before a warrant is issued. 8 U.S.C. § 1357(a)(2).

(ECF No. 11 at 6-7).

Rosado asserts she was detained because she was "identified" by immigration officers at her home during the execution of an arrest warrant on her son by local police. She asserts that before allowing the police to enter she asked if "they had a warrant, and asked them to show any warrant in their possession prior to allowing them to come in. Once the officers showed the warrant, she allowed them to enter, but they also detained her, claiming that she obstructed their operation by asking to see the warrant." (ECF No. 1 at 4).

Given this record, it appears the local police detained Rosado, and that they did so without a warrant, and that ICE then took Rosado into custody.

An arrest or detention constitutes a "seizure" under the Fourth Amendment and must be reasonable under the circumstances. *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011). Although some courts have held that, with regard to the execution of an arrest warrant, "officers may briefly detain those on the premises while they seek to execute an arrest warrant," *United States v. Mastin*, 972 F.3d 1230, 1238 (11th Cir. 2020), *see also Cherrington v. Skeeter*,

344 F.3d 631, 638 (6th Cir. 2003) (holding "the police have [] limited authority to briefly detain those on the scene, even wholly innocent bystanders, as they execute a search or arrest warrant."), the Ninth Circuit Court of Appeals has held that although the police have a right to detain occupants of a house while a search warrant is being executed, it is arguable this same right extends to detaining bystanders during the execution of arrest warrants. *See Sharp v. County of Orange*, 871 F.3d 901, 913-915 (9th Cir. 2017).

The detention of a resident of a dwelling must be reasonable in scope and duration, and detentions that are unduly prolonged or exploitative may violate constitutional protections. *United States v. Bullock*, 632 F.3d 1004 (2011). Courts have emphasized that the manner of detention must balance law enforcement's interests against the individual's Fourth Amendment rights. For example, in *Muehler v. Mena*, the Supreme Court upheld the detention of an occupant of a residence in handcuffs for two to three hours during the execution of a search warrant, finding that the intrusion was outweighed by the government's safety interests because the officers believed weapons were present in the home and that the home's occupants were gang members. 544 U.S. 93, 99-100 (2005). The *Muehler* Court also found the officers did not need an independent reasonable suspicion to question the occupant as to their immigration status; however the Court concluded such questioning did not constitute a discrete Fourth Amendment event only because that questioning did not prolong detention that was otherwise justified. *Id.* at 101-02. This is clearly distinguishable from Rosado's situation, where her detention resulted from asking to see a warrant. This did not implicate officer safety concerns nor did Rosado obstruct the execution of the warrant. Additionally, Rosado's detention was the result of the questioning as to her status, rather than the prolonging of any detention incident to the execution of the warrant; that Rosado's son was presumably an immigrant without authorization does not afford reasonable suspicion that Rosado had committed a "crime" of being in the United States without authorization.

Subsection (a)(1) of 8 U.S.C. § 1137 provides: "Any officer or employee *of the Service* authorized under regulations prescribed by the Attorney General shall have power

without warrant … to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." This section does not authorize a local police officer to interrogate a person as to their authorization to be in the country. Subsection (a)(2) allows a federal officer to "arrest," without a warrant, "any alien who in his presence or view is entering or attempting to enter the United States in violation of any law or regulation," a situation not relevant to Rosado being in her home. Subsection (3) of the statute is not applicable in this matter.

Subsection (a)(4) of 8 U.S.C. § 1137 provides a federal officer may make an arrest without a warrant

> … for felonies which have been committed and which are cognizable under any law of the United States regulating the admission, exclusion, expulsion, or removal of aliens, if he has reason to believe that the person so arrested is guilty of such felony and if there is likelihood of the person escaping before a warrant can be obtained for his arrest …

Rosado's presence in the United States was not, and is not, a felony, nor was there any likelihood of her "escaping" before a warrant could be obtained.

Finally, subsection (a)(5) of 8 U.S.C. § 1137 provides a federal agent may, without a warrant, make an arrest "for any offense against the United States, if the offense is committed in the officer's or employee's presence," or arrest a person "for any felony cognizable under the laws of the United States, if the officer or employee has reasonable grounds to believe that the person to be arrested has committed or is committing such a felony." As with subsection (4), Rosado's arrest was not permitted under subsection (5).

This statute also provides that state or local officers may perform the function of an immigration officer under a written agreement with the United States Attorney General. Respondents do not aver, or provide proof of, an agreement between the Milford Police Department and the United States Attorney General that would allow the Milford Police to arrest Rosado without a warrant pursuant to § 1357.

On the record before the Court, Rosado's detention during the execution of a warrant on her son, presumably justified by Rosado asking to see the warrant or on the

basis that her son was an noncitizen in the United States without authorization, and her warrantless arrest, were in violation of her Fourth Amendment rights. *See Perez Cruz v. Barr*, 926 F.3d 1128, 1143 (9th Cir. 2019). *See also Ortega Melendres v. Arpaio*, 836 F. Supp. 2d 959 (D. Ariz. 2011) (holding "[l]ocal law enforcement officers, however, do not have the 'inherent authority' to investigate civil immigration violations, including status violations.").

Rosado's current detention violates her constitutional rights because her arrest was in violation of her Fourth Amendment rights. The local police came to Rosado's residence to execute a warrant on her son. Rosado asked to see the warrant, and the police showed her the warrant. Respondents do not assert that Rosado did anything at that point other than stand aside and allow the police to execute the warrant; specifically, Respondents do not allege that Rosado attempted to flee or assist her son or anyone else on the premises to flee, nor did she threaten the officers in any way, nor did she do anything to thwart the orderly completion of the arrest of Rosado's son. A resident asking to see a warrant during its execution does not automatically constitute obstruction. *Compare Dawson v. City of Seattle*, 435 F.3d 1054, 1066-67 (9th Cir. 2006) (holding that detaining occupants *during a search* was reasonable to ensure the safety of officers and the orderly completion of the search); *United States v. Sanchez*, 555 F.3d 910, 918-19 (10th Cir. 2009). And notably, Rosado was not detained only during the search. Rosado was taken into custody, and is still in custody, for no other reason than that she is a noncitizen in removal proceedings. That Rosado's son was in the country without authorization was not probable cause or reasonable suspicion to presume that Rosado was in the country "without authorization." Furthermore, Respondents do not address the subject statute's requirement that a warrantless arrest of a noncitizen who has not committed a crime is permissible only if the noncitizen is "likely to escape before a warrant is issued." Rosado was in the country for years with the acquiescence of the government, at the same address, and was not under an order of removal and was scheduled for a hearing regarding her application for withholding of removal. All of these factors weigh against any conclusion that she was likely to

1    "escape" from the United States should the local police or ICE take the time to seek a

2    warrant for her arrest.

3        Accordingly, Rosado's release from detention should be granted because her Fourth

4    Amendment rights were violated.

5    **IV.    Conclusion**

6        "Freedom from imprisonment—from government custody, detention, or other

7    forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas*,

8    533 U.S. at 690. Being free from physical detention is "the most elemental of liberty

9    interests." *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004) "[W]hile [DHS] might want to

10   enforce this country's immigration laws efficiently, it cannot do that at the expense of

11   fairness and due process." *Ceesay*, 2025 WL 1284720, at *1. And "there is something

12   fundamentally unfair about the government's changing the rules by fiat simply because it

13   wants to. That is arbitrary by definition." *Mata Velasquez*, 2025 WL 1953796, at *9.

14   "Luring noncitizens here, paroling them for a period of time, and then telling them 'never

15   mind' is just plain wrong—made even worse when the noncitizens are detained while their

16   cases are heard. And a change in administration does not justify or excuse such

17   fundamental unfairness." *Id.*

18       A basic principle—that individuals placed at liberty are entitled to due process

19   before the government again imprisons them—has particular relevance here, where

20   Rosado's detention was previously found to be unnecessary to serve any purpose.[8] Based

21   on the record before the Court, but for Rosado's presence at her residence when the local

22   police were executing an arrest warrant for her son she would not be detained. That she

23   was at the residence at that time was happenstance. And there is no allegation that Rosado's

24   detention beyond the execution of the warrant was necessary or authorized and, therefore,

25   her detention at that time violated her Fourth Amendment rights, which are afforded all to

26   all those peacefully residing in the United States. Rosado did not sneak across the border,

27   she has resided in the United States for more than six years, she has committed no crime,

28

---

[8] And although the term used throughout is "detention," in truth Rosado is imprisoned.

and there is no evidence before the Court that Rosado has not appeared for all scheduled hearings or that any circumstance or her behavior has changed since she was allowed to reside in the United States. Rosado's release from custody in 2018 provided her with a protected liberty interest. The government may not unilaterally take away her liberty.

The IJ's conclusion that they did not have jurisdiction to reconsider Rosado's detention was in contravention of the governing statutes, rendering the continuation of her detention violative of the laws of the United States. Furthermore, Rosado's detention without a meaningful opportunity to be heard violated her right to receive due process of law before her liberty was proscribed, and her detention is also in violation of her Fourth Amendment rights.

Rosado's immediate release, and her return to Massachusetts and the return of jurisdiction over her application for asylum or other form of relief from removal to the Massachusetts Immigration Court is required to return her to the status quo ante—"the last uncontested status which preceded the pending controversy." *Pinchi v. Noem*, No. 25-cv-05632, 2025 WL 1853763, at *3 (N.D. Cal. July 4, 2025). *See also Valdez*, 2025 WL 1707737, at *5 (ordering immediate release of unlawfully detained noncitizen); *Günaydın*, 2025 WL 1459154, at *10–11; *Ercelik v. Hyde*, No. 25-CV-11007, 2025 WL 1361543, at *15-16 (D. Mass. May 8, 2025); *Kuzmenko v. Phillips*, No. 2:25-cv-00663, 2025 WL 779743, at *2 (E.D. Cal. Mar. 10. 2025). To provide Rosado her liberty and the process which was taken from her, the Respondents must immediately release Rosado from custody. Respondents should also be prohibited from detaining Rosado during the pendency of any appeal of an order adopting this Report and Recommendation and during the pendency of a *final* decision regarding her removal, including an appeal to the BIA. Respondents should not be allowed to  re-detain Rosado at any time without a pre-deprivation bond hearing before the Massachusetts Immigration Court. Respondents should not be allowed to detain Rosado unless the government demonstrates, prior to detention, by clear and convincing evidence, that her detention is required.

1    Accordingly,

2    **IT IS RECOMMENDED that** the petition for habeas relief pursuant to § 2241 be

3    **granted forthwith**.

4    Because Rosado has been scheduled for a master hearing on August 14, 2024, at

5    which time she may be ordered removed and denied relief from removal, resulting in her

6    continued and potentially lengthy detention during an appeal or pending her removal, and

7    because an order of removal and detention pending removal may moot any relief pursuant

8    to § 2241,

9    **IT IS FURTHER RECOMMENDED that the Court order** Rosado's immediate

10   release from detention, and further order the hearing set for August 14, 2025, at Eloy, **be**

11   **vacated**, and order Rosado's removal proceedings be **transferred** back to the

12   Massachusetts Immigration Court.

13   This recommendation is not an order that is immediately appealable to the Ninth

14   Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of

15   Appellate Procedure, should not be filed until entry of the District Court's judgment.

16   Ordinarily, pursuant to Rule 72(b), Federal Rules of Civil Procedure, the parties are

17   allowed fourteen (14) days from the date of service of a copy of this recommendation

18   within which to file specific written objections with the Court. However, given the urgency

19   of this matter, However,

20   **IT IS FINALLY RECOMMENDED that the Court order Respondents to file**

21   **any objections to this Report and Recommendation within forty-eight (48) hours of**

22   **the time this Report and Recommendation is docketed**.

23   Pursuant to Rule 7.2(e)(3) of the Local Rules of Civil Procedure for the United

24   States District Court for the District of Arizona, objections to the Report and

25   Recommendation may not exceed ten (10) pages in length. Failure to timely file objections

26   to any factual or legal determinations of the Magistrate Judge will be considered a waiver

27   of a party's right to de novo appellate consideration of the issues. *See United States v.*

28   *Reyna–Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc).

//

Dated this 11th day of August, 2025.

Camille D. Bibles
United States Magistrate Judge